Erica Turner for the appellants. Very briefly, I want to provide a procedural update since the completion of the briefing on the interlocutory order granting preliminary injunction. Since that briefing was completed, the moving party, PMC, was dismissed along with all of its alleged claims. There was never an operable complaint by PMC. KMW Business Jets was not a party when it was enjoined by the order granting preliminary injunction. It was subsequently added as a party defendant to JM International's claims for fraudulent transfer or alleged fraudulent transfer. Finally, there was a trial in November of 2019. It was a three-day trial the week before Thanksgiving. It was started and concluded. We do not have any rulings. So the issues on appeal, we believe, are still right. Are we running pretty close to mootness? We've got one of the parties dismissed. And any day now, the case could become moot if a permanent injunction is entered. I understand. That's why I brought the matter up. We do have closed evidence. That is certainly a risk, and it would be our position that it's important that we have this issue resolved before perhaps the judge is ruling to provide some additional guidance to him. And certainly from my client's standpoint, the appellants, we are in the same position we were in a year ago, except more harmed, the extent of which is unknown. The debtor, Debt Midwest Group, was never restrained. The status of the collateral is unknown. And the appellants have secured lenders with liens prior to JM International's judgment, prior to them even having a complaint or a claim with respect to the Ohati Trust. That remains unsatisfied. There's $10 million outstanding approximately. So sitting here today, we still have that same harm as a result of the wrongful injunction. The evidentiary hearing that was set for January 3rd, 2019 is certainly not our position that in every instance in which there's a request for injunctive relief, there's a requirement or evidence to be taken. Sometimes it's apparent from the affidavits accompanying the motion. But here, the district court adopted the TRO wholesale in its order on preliminary injunction. And that temporary restraining order, in two of the data phase factors that were analyzed by the district court, the judge said the evidence needs to be fleshed out. There's insufficient evidence. There is a lack of clear evidence. And in that instance, then there certainly needed to be evidence taken at the January 3rd hearing or as soon thereafter as the court could hear it before issuing the preliminary injunction. And it is the Winter versus National Resources United States case and then the Eighth Circuit cases underneath it that we cite to as the primary basis for our appeal. And that is that there was an arbitrary analysis under each of the data phase factors and therefore an abuse of discretion. The most significant of which is the lack of irreparable harm being shown. There was no clear evidence of a threat of irreparable harm. Instead, there was a possibility supported by allegations of a possible threat of irreparable harm. And that is inconsistent with the notion that injunctive relief is an extraordinary remedy. And that is where we have error. The injunctive relief here is essentially trying to maintain a status quo? Wasn't that the basic objective? Certainly, that was the court's comments at the preliminary injunction hearing. However, in the TRO, two of the four factors, including probability of success on the merits, he said we need to develop the record before determining whether or not there's a threat of injunctive relief or a threat of irreparable harm if we don't maintain the status quo. And that status quo is that there is the only thing he cited was there is a possible conflicting interest in some of the foreclosure inventory. And if we go back and we look at the moving parties papers, PMC claimed to have an ownership interest in 1,090 parts out of 85 plus thousand parts that were listed in the foreclosure inventory. JAM International, the joining party, said they had a security interest, competing security interest in 410 of those parts. There were over 85,000 parts subject to foreclosure. Well, it wasn't just any security interest. It was a potential purchase money interest, which would have been superior to everybody else's as to those parts. As to those parts and, Your Honor, to those competing security interests, we said before the preliminary injunction hearing, and it was brought to the attention of both JAM International and the court, we will remove those from the foreclosure list. Those 410 parts that you cite to when you say there is a competing security interest, that purchase money security interest, we'll remove those. So that was moot by the time of the injunction. But my understanding is didn't either the parties or the district court express, the district court actually expressed some doubt as to whether they had found all of the parts or had an opportunity to figure out which parts were Boeing from the Boeing aircraft and which parts were not. So, no, that was not a finding that he made. With respect to irreparable harm, what he said is there is, and there was only one finding on irreparable harm in the preliminary injunction order that adopted the TRO, and that was that those parts that there was a competing ownership interest, and let's assume he meant both ownership and security, that because there was a lot sale, it would be difficult to determine whether those parts were going to be sold for a specific price and what the amount of the money damages would be. That would be difficult to determine. That was his conclusion. Now, JM International did argue that because the debtor, Jet Midwest Group, had conflicting schedules of what their assets were, that the court should disregard the entire list. That is not sufficient to have clear evidence of a conflicting interest in the inventory. What about the fact that, and I think this was undisputed, that at one point Jet Midwest Group claimed we no longer have the Boeing aircraft, it's gone, we have no access to it, and then later on these parts show up. Does that sort of lend some credence to the fact there may be some other parts in there that the parties don't know about that actually belong to the Boeing aircraft? Well, Your Honor, to the extent that there was any doubt, the ones that were identified, the 410 that were identified, were immediately removed from the list of secured lenders. To the extent that there is potentially additional items on that list, that was the purpose of the evidentiary hearing. That was the purpose of having that hearing. And we were there, ready to go, and no evidence was taken. It was truly shocking that then the preliminary injunction just wholesale adopted the TRO. That was the issue. And the TRO asked that question, and when the district court said conduct some discovery and here are the questions to be answered, that was the exact question to be answered is, is there anything else? And yet, and actually the day before the evidentiary hearing, January 2nd, there was an order issued reminding the moving parties of the burden that they had to show that a preliminary injunction should issue. And we get to the hearing, and no evidence was taken. And with no evidence being taken to then just adopt that TRO wholesale, that's really what was critical in, we think, and we pointed to in our papers, that was the critical error. What do you want us to do? Vacate this injunction and send it back for a hearing? Yes. Yeah, it was. What would be the point of that when there's already been a full-blown bench trial? Well, currently. You want to do something with these quickly before the judge rules? You want to do something with the property that's at issue? So, Your Honor, we don't know how long it's going to be before there is a ruling. And every day, without Jet Midwest Group having any restraint, we assume it's selling its collateral in the ordinary course of its business, but we don't know. We need to be able to proceed. And so long as there is this injunction, our hands are tied. And we sit here. You want to proceed with what, precisely? We want to proceed with the foreclosure sale. We tried to mitigate against the damage by saying we'll agree to a trial as soon as possible. We'll agree to argue on the bond. But ultimately, when tested on the evidence, PMC withdrew. And ultimately, there was not one iota of evidence that there was any other parts beyond the 410 identified by JM International. So if there had been a test of the evidence, we are confident that there would have been no injunction that would have issued. And certainly, no bond. Ultimately, the district court tried to correct that with a million-dollar bond, but that proved insufficient. Did you seek, at any point, did you seek expedited appeal? Now, sometimes we don't grant it. Often we don't grant it. But I'm curious whether you asked us for expedited appeal in light of the irreparable injury that your clients are suffering. We did not. We did not see other cases in this circuit where injunctive relief and abusive discretion issue that we had here was appropriate for expedited relief. And we've heard some arguments today where, understandably, there may be some life and death issues as opposed to a dispute over funds. So we did not do that. And I understand the pending mootness issue. We are certainly aware of that. We still think it's important. And it is a good case to analyze the court's conduct in adopting a TRO wholesale without taking the evidence he cited as necessary before entering that preliminary injunction. But he's in a position now where he's heard all the evidence, right? He has. So if we vacated this injunction, I suppose he could enter a new one immediately based on the hearing if he still thought that was where he's going in the ultimate ruling. Now he has the benefit of all the evidence. Yeah. So that would certainly moot this appeal. We acknowledge that point.  All right. With that, I'll pass. Mr. Epstein? May it please the court, my name is Eric Epstein. I represent the plaintiff, appellee, and judgment creditor at Midwest International Co., Ltd. The district court's decision to enter a preliminary injunction should be affirmed. Today I'd like to focus on two issues. First, the merits of the district court's order. And second, appellant's procedural actions. Would you address also the concern for mootness and what the effect of a ruling by this court could have? Yes, Your Honor. Regarding the issue of mootness, at this instant the appeal is not moot. Since right now the preliminary injunction is still serving the functional purpose of maintaining the status quo until such time as the district court issues its final decision. Once that decision is issued, the appeal, of course, will be moot. What's the real purpose of our going ahead and making a decision at this point? Even though it may not be moot in technical terms, what would really be the functional basis for a decision from our court? Your Honor, I think as a practical matter, if this court were to resolve this appeal now, then whatever guidance this court provided could be used by the district court when the district court enters its final decision on the merits. I think that's really the only practical relationship that remains. This appeal and what's happening above. Wouldn't the other side be able to proceed with its foreclosure if we vacated the injunction? If this court were to vacate the injunction, then as a practical matter, the other side could issue a new foreclosure notice, or on the basis of the prior foreclosure notice, attempt to foreclose. That's correct. The practical effect of that would be to create chaos below before the district court. Because at this very moment, the issue before the district court, or one of the practical issues before the district court, is not only whether to enter a permanent injunction, but also whether to appoint a receiver of everything that remains of Jet Midwest Group's estate. And that ties very much into the evidence that Judge Gaitan heard on January 3rd, 2018, going to what already then appeared to be a massive fraud committed by JMG against a bankruptcy judge in Delaware. All of the creditors of JMG, and my client specifically as well. So one of the issues that Judge Gaitan is looking at at this moment is whether to appoint a receiver to conduct an orderly liquidation and equitable distribution of what remains of JMG's estate. What the preliminary injunction is doing right now is just to maintain the status quo for a little while longer until the district court is able to resolve that issue with finality. What was the irreparable harm that you think supports the preliminary injunction? The irreparable harm was the concealment of collateral. That's what Judge Gaitan was referring to in citing the Textron case. We've drawn this panel's attention to additional cases that go to the same point. That concealment of a secured creditor's collateral is irreparable harm. And that makes practical sense. An award of money damages cannot substitute for collateral. Since the whole point of having collateral is that the creditor should not have to pursue an award of money damages and chase the enforcement of it. So that was the legal principle that Judge Gaitan was addressing in relation to the irreparable harm analysis. Concealment of all collateral or concealment of the Boeing aircraft parts collateral? There are two types of collateral at issue here, Your Honor. Number one is the Boeing aircraft collateral. Number two is that my client is not only a judgment creditor, but also a garnisher. By serving a garnishment writ, my client obtained a lien over anything that remained of JMP's physical inventory. Notably, upon review of the Ohati Trust's foreclosure notice, which was announced on November 29, 2018, we observed that one of the liens expressly relied upon by the Ohati Trust is dated February 23, 2018. That notably was 24 hours after my client had served a garnishment writ. So the Ohati Trust, in seeking to foreclose, is relying on a lien that on its face is a fraudulent transfer under the fraudulent transfer statute, clearly designed to obstruct the enforcement of my client's garnishment. But also, even under a straightforward UCC analysis, is second in time. The Ohati Trust is not the senior creditor. My client is. So the big picture here is we brought to the District Court's attention that virtually all of this foreclosure inventory was inventory that JMG had omitted from its prior sworn statements to the bankruptcy judge in Delaware, not to mention to us in post-judgment discovery. We brought this information to the District Judge's attention as part of the briefing of the TRO motion following the foreclosure announcement. With all of this inventory suddenly coming to light, the problem was that there naturally were conflicting claims to it. And these claims were complex for many reasons. And it all started with the sheer amount of inventory that had been concealed from the bankruptcy judge and from us. We were looking at 46 aircraft and over 80,000 spare parts that had never been mentioned in JMG's sworn statements to the federal bankruptcy judge in Delaware, and that we were looking at for the first time in this subsequent foreclosure announcement. And according to the foreclosure announcement, all of this inventory was in the possession of JMG months or years before that bankruptcy case was ever filed. But it was entirely omitted from all of the bankruptcy schedules and came to light for the first time in this foreclosure announcement on November 29, 2018. And just to put that in perspective, in terms of volume of inventory, in terms of orderly liquidation value of inventory, what JMG had omitted from its bankruptcy schedules was in excess of everything that JMG had included in those schedules. So we were talking about the lion's share of JMG's estate suddenly coming to light months after the conclusion of a bankruptcy case in the form of a foreclosure announcement by appellants. Appellants were trying to foreclose by enforcing liens that they created only after the entry of the judgment in the term loan action below. As I mentioned, the Ohati Trust was seeking to enforce a lien created 24 hours after my client had served a judgment enforcement garnishment rent. In trying to enforce these liens, the appellants were now claiming that they were not and never had been owners of JMG. But before the entry of that judgment, the appellants and JMG had claimed the opposite, that the appellants were owners of the judgment debtor, JMG. And perhaps most importantly, in its TRO order, the district court directed JMG during this period of expedited discovery to sit for a deposition and answer questions on particular topics defined by the district court in that TRO order, among which was, why is it that this foreclosure announcement is saying something entirely different from JMG's prior sworn statements to us in relation to the status of my client's collateral? What explains this discrepancy? And what happened at that deposition? JMG's counsel repeatedly instructed JMG's 30B6 representative not to answer questions on that very topic. And this was brought to Judge Gaitan's attention prior to that January 3rd hearing. So the district court had these conflicting claims to inventory, conflicting information, and had to make a practical decision about what to do. The district court's reasoning was that because of the way this auction was designed, if the auction had gone forward, it would have obliterated the district court's ability to get to the bottom of whose collateral is in this inventory and how should any purchase price be allocated. And that's because the appellant's plan was to sell everything, whatever everything was, in the form of one or two large lots in 20 days' notice, with no guidance from a professional broker or aviation expert. It was appellant's litigation counsel who had appeared in the fraudulent transfer case who was managing this auction process. And the district court's concern clearly was that at the end of the day, you're going to be looking at an empty warehouse, no real idea of what had just happened, let alone whose collateral had been sold or how to allocate any purchase price. And so the district court made the practical decision to enter this PI, which further postponed the auction date. The district court set an expedited date for trial and allowed additional time for fact discovery. That's all that happened here. It was an appropriate exercise of discretion under data phase. And it was particularly appropriate because at that January 3rd hearing, counsel were in agreement as to the holding of an expedited trial, so it was known that the preliminary injunction would only have to be in place for a very short time. And the district court did indeed, as the panel has heard, conduct the final trial on the merits last year as promised. Regarding the 410 parts, appellants agreed to remove those parts on December 19th, 2018. And I want to draw attention to that date because that was one week after the district court had entered its PRL. So what was happening here is only that the appellants were beginning to alter their conduct in response to the motion that had been made and the entry of orders by the district court. The fact that appellants began to change their conduct in response to the district court's orders cannot be a valid basis for challenging those orders. It's just proof that the orders were necessary. And it's not just about 410 parts. The Boeing aircraft that was my client's original collateral had far more than 410 parts. And that's not even to mention the lien over all of JMG's inventory that my client had by virtue of its garnishment writ. Turning to procedure, the procedural objections to the order, there are just a couple quick points that I would mention. This isn't a case in which the original TRO was offered on an ex parte basis. There was one motion made for a TRO and preliminary injunction. Before the district court entered any orders, appellants submitted their complete written opposition to that motion for a TRO and preliminary injunction. It was with the benefit of all that briefing that the district court entered the temporary restraining order. In appellant's opposition papers, appellants never once asked for an evidentiary hearing or suggested the need for one. And so the district court could have entered the TRO and preliminary injunction right then and there. But the district court opted to enter a TRO, allow additional time for fact discovery, and set this January 3rd hearing. Not to think further about the need for a preliminary injunction. You mentioned the fact that there's not a real good cataloging of parts. And that seems to be somewhat undisputed, at least initially. I take it the receiver's role, and we're kind of going behind what just happened in trial, but the receiver's role, as you mentioned, would be to come up with an orderly disposition of the parts? Or is that sort of what Judge Gaitan had suggested would be one of the primary roles of the receiver? The relief that we are seeking in relation to the appointment of a receiver would be a receiver who would play various functions. But this would include to get to the bottom of what is in JMG's estate, including its physical inventory. Since we have heard so many different stories from JMG, many of them under oath, but contradicting each other as to what is in its estate, including the composition of this physical inventory. The receiver would take stock of the estate, devise an orderly limitation plan to maximize value for all creditors, which might have happened in Delaware if this inventory had been revealed then, instead of being concealed from the bankruptcy judge, and to equitably distribute the proceeds of that liquidation. That's precisely what would happen. Turning back to procedure for a moment, the District Court's TRO was immediately violated when JMG's representative appeared for a deposition but was repeatedly instructed not to answer questions on the very topic for expedited discovery that the District Court had delineated in the TRO. Why is it that my client's collateral was concealed during post-judgment discovery, but either in whole or in part is being revealed only now in the form of a foreclosure announcement? JMG's representative, instructed by counsel, refused to answer questions on this topic. And this information was given to the District Court before the January 3rd hearing. The final point I'd like to make with the brief time I have remaining is to point to the October 3rd, 2017 email that's reproduced on pages 31 and 32 of our opposition brief. This is an email among appellants, JMG's CEO, and appellants counsel, Brad Helsman. And what this email shows is that this is a foreclosure that was planned collusively by the appellants and JMG. Its purpose was not to induce competitive bidding. It was for the Ohati Trust to take JMG's assets. And procedurally, what's important about this email is that the appellants concealed it all the way through and including the entry of the preliminary injunction, producing it only after that order was entered. And so procedurally, the significance of this email is that Judge Gaitan was right, that it would have been premature at that January 3rd hearing to try to determine with finality the competing claims to this inventory because the appellants were still concealing critically important information about their role at JMG and the purpose of the foreclosure. I thank the Court for its time. Thank you, Mr. Epstein. Ms. Turner? Your Honor, the focus of my opponent's argument was really that JMG is a bad actor, that JMG was hiding assets, that it wasn't being honest with its creditor, JM International. That does not comport with the Court's order. If that were the case, if that was really what the judge was interested in, then he would have restrained JMG. There was no restraint of Jet Midwest Group, no order that related to Jet Midwest Group at all. The only party that was restrained was the secured lender, the Ohati Trust and KMW Business Jet Purchase Money Security Interest Holder. Now, counsel says that there was a February 23rd, 2018 lien and failed to recognize that that was an amended and restated security agreement for the Ohati Trust that was entered in conjunction with a forbearance agreement. And actually, the security agreement, the prior valid lien was in August of 2015 before JM International even made a loan to JMG, to Jet Midwest Group. There was no dispute with respect to any part other than the 410 parts that were identified by JM International. If that was truly a competing interest, then those could have been excluded from the foreclosure sale. In fact, we voluntarily agreed to do so. That should have been the extent of the restraining order, not the possibility of actual harm, but clear evidence of actual harm. That's what we had lacking here. And with respect to the purpose of this appeal, it's to write an abuse of discretion and to sit and wait until Judge Gaitan makes his decision. He's not being helped by no guidance from above. It would only help him so that his abuse of discretion is not exacerbated, and we're right back up here. So we do ask for a decision on the appeal and believe it will help in the final resolution of the party's disputes. With that, unless there's any further questions, I'm out of time. Thank you, Ms. Turner. Court thanks both counsel for the argument you've provided to us on a factually complicated matter, and we'll take the case under advisement and render decision in due course. Thank you.